IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| THOMAS W. DOOLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:17-cv-00282 |
| | ) | |
| CAPSTONE LOGISTICS, LLC, *et al.*, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Thomas W. Dooley asserts a hostile work environment claim and a retaliation claim against his former employer, Capstone Logistics, LLC,[1] under Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e. His same-sex hostile work environment claim is based on conduct by his direct supervisor, Curtis Howe, which included an incident in which Howe pinched Dooley's buttocks and another in which he made an offensive sexual "joke." Dooley further alleges that he was terminated in retaliation for complaining about Howe's conduct.

Pending before the court is Capstone's motion for summary judgment (Dkt. No. 48), which is fully ripe and was argued before the court. The court will grant the summary judgment motion as to the hostile work environment claim because, under the legal standards set forth by the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit, Dooley has failed to put forth adequate evidence from which a reasonable jury could find that Howe's conduct toward him was "because of sex." The court concludes, however, that there are disputes regarding material facts that preclude summary judgment with regard to the retaliation claim. Thus, the court will deny the

---

[1] Dooley names three defendants: Capstone Logistics, LLC, National Freight Handlers, LLC, and National Freight Handlers, Inc., which is now known as National Freight Handlers, LLC (NFH). (Corporate Disclosure Statement, Dkt. No. 8.) Capstone Logistics, LLC is a parent company of NFH (*id.*), and the motion is brought on behalf of all defendants. The court will refer to them collectively as Capstone, just as the parties did in their briefing.

summary judgment motion as to the retaliation claim. For like reasons, the court will deny summary judgment as to the punitive damages claim.

Because of the upcoming trial date, and in light of the parties' own familiarity with the factual and legal issues, the court will abbreviate its explanation of its ruling. In particular, the court will discuss facts only in context, and as needed, and will dispense with a statement of the standards governing summary judgment under Federal Rule of Civil Procedure 56.

**I. Same-Sex Hostile Work Environment Claim**

    **A. Facts relevant to hostile work environment claim**

Dooley began working for Capstone in October 2015 at a facility that is a warehouse complex for the Kroger supermarket chain. Several employers operate at that facility. He worked as a switcher operator, towing trailers within the facility and sometimes on public roads. For most of each shift, he was in his switcher vehicle. Howe, Dooley's direct supervisor, began working for Capstone in May 2016, and he generally worked the same shift as Dooley. Ben Truett was Howe's supervisor. Truett testified—without contrary testimony from Dooley—that the Capstone work force of 70 to 90 people was approximately 90 to 95% male. (Truett Dep. 29, Dkt. No. 60-5.) Likewise, Howe testified that it was about 95% male. (Howe Dep. 22, Dkt. No. 60-4.) At least two of the women there worked as administrative staff rather than as switcher operators. (Truett Dep. 29; *see also* German Roman Dep. 24–25, Dkt. No. 60-3 (testifying that he was a former switcher operator for Capstone and that there was one female driver and one female security guard during the shared time of his and Howe's employment).) Truett testified that there is some use of "salty" language by Capstone employees in the overwhelmingly male workplace. (Truett Dep. 55.)

Dooley alleges that, on a near-daily basis, Howe winked at him and waved at him in an "effeminate" way. (Dooley Dep. 59–60.) According to Dooley, he also saw Howe wink at "some other guy[s] sometime[s]." (*Id.* at 56.) There were also two specific incidents that Dooley relies on

2

to establish his hostile work environment claim. First, on or about June 26, 2016, Dooley was having trouble communicating over the radio in his switcher, and he commented at the end of the shift that he had a sore throat. At the time, he was in an office with Howe and two other employees. In response, Howe said something to the effect of, "It's from all them dicks you have been sucking." (Dooley Dep. 67, Dkt. No. 60-2.) Dooley was "pissed off" and "mad." He went to the bathroom and threw cold water on his face to "control [his] temper." (*Id.* at 68.) He then walked out and told Howe "[D]on't you never ever disrespect me like that again, ever." (*Id.*)

Second, on or about July 8, 2016, Dooley claims that as he was climbing into his switcher, Howe walked by and "pinched [his] butt and said, 'it's time to get to work, child' or something similar to that." (*Id.* at 72.) According to Dooley, no one saw that happen.[2] Dooley was "pissed off," but did not say anything to Howe at that time.

It is undisputed that, at some point after the July 8, 2016 incident, Dooley complained to Truett about Howe's June 26 comment. Dooley claims that, at the same time, he complained about the butt-pinching incident, although there is some conflicting evidence about what Truett did, if anything, in response to Dooley's complaint. Dooley admits that there were no additional incidents after Dooley complained, other than the continued winking and waving. Dooley was terminated about one week after the July 8 incident.

Dooley interpreted the winking, waving, and two incidents, taken together, as Howe's expressing a sexual interest in him. Relatedly, Dooley believed that Howe was gay, a belief that Dooley discussed with other co-workers and that other witnesses testified was their belief, as well. Dooley, admits, however, that Howe never told Dooley he was gay, that Howe never asked Dooley on a date or directly propositioned him, that he never "came onto [him] sexually," and that, to Dooley's

---

[2] Howe admits that he made the first comment, said he meant it as a "joke," and claims he was verbally counseled by Truett for making the comment. (Howe Aff. ¶¶ 5–6, Dkt. No. 49-5.) He denies the second incident, although the court accepts it as true for purposes of summary judgment.

3

knowledge, Howe never told anyone he was gay. Furthermore, Howe denied in his deposition that he is gay.

B. Discussion

To establish a Title VII hostile work environment claim, Dooley must show that Howe's conduct was: (1) unwelcome; (2) based on Dooley's sex; (3) "sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive work environment"; and (4) that there is some basis for imputing liability to Capstone. *Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc) (setting forth elements of a Title VII hostile work environment claim based on race); *Mikels v. City of Durham*, 183 F.3d 323, 329 (4th Cir. 1999).

Capstone argues that it is entitled to summary judgment on the hostile work environment claim for three independent reasons. First, it claims that Dooley cannot prove that Howe's conduct was because of Dooley's sex, so as to satisfy the second element of his claim. Second, it contends that the harassment was not severe or pervasive. Third, it argues that Howe's behavior cannot be imputed to Capstone because it exercised reasonable care to prevent and correct any harassing behavior.

The court need not reach Capstone's second or third arguments because it finds that the first one is persuasive. While it may seem intuitive that the pinching of a person's buttocks, regardless of the sex of the two individuals, is an act based on sex, the Supreme Court and the Fourth Circuit have cautioned that, to be actionable, alleged harassment must be "discrimination because of sex," and not conduct "merely tinged with offensive sexual connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quotations omitted). That is, it is not enough that the harassment "have sexual content or connotations." *Id.* at 80. Additionally, the court must ensure that it does not "mistake ordinary socializing in the workplace—such as male-on-male horseplay . . . for discriminatory 'conditions of employment.'" *Id.* at 81.

4

The *Oncale* Court identified three ways to prove sex discrimination in same-sex harassment cases: (1) establishing "credible evidence that the harasser [is] homosexual"; (2) establishing that the victim is harassed in such sex-specific and derogatory terms by [a member of the same sex] as to make it clear that the harasser is motivated by general hostility to the presence of [the same sex] in the workplace"; or (3) establishing "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80–81.

Dooley's counsel argued that there was evidence from Dooley that he never saw Howe wink at any women, only men, thus implicating the third evidentiary route, but the court disagrees. The overwhelmingly male workforce at Capstone cannot be viewed as a "mixed-sex" workplace, nor was there much opportunity for any employee to observe Howe's interactions with any female subordinates; he apparently had one, at most, during the time that both he and Dooley were employed there. And there is no evidence of the second method of proof, either, nor does Dooley make that argument.

Thus, the court must determine whether there is sufficient evidence in this case for a reasonable jury to find Howe's actions toward Dooley were "because of sex" under *Oncale*'s first method of proof—establishing "credible evidence that the harasser [is] homosexual."[3] The Fourth Circuit expounded on this method in *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255 (4th Cir. 2001), which involved West Virginia's anti-discrimination statute and in which the court reversed a jury verdict in the plaintiff's favor and remanded with instructions to enter judgment for the defendant. The *Lack* court explained that credible evidence that the harasser is a homosexual, coupled with an

---

[3] At argument, Dooley's counsel raised thoughtful questions about the propriety of requiring "credible proof" of the sexual orientation of the alleged harasser, exactly what that evidence would look like, and whether seeking or putting on such evidence would be harassing in and of itself. Moreover, requiring proof of sexual orientation when, for example, a male is harassed by another male, but not when a female is harassed by a male by the same conduct (pinching of the buttocks, for example), seems to give male victims of male harassers less protection than female victims. Furthermore, *Oncale* was decided twenty-five years ago, when same-sex harassment may have been perceived differently than it would be today. But this court's obligation is to apply the law of Title VII faithfully as it has been interpreted by the Supreme Court and the Fourth Circuit.

earnest explicit or implicit solicitation of a sexual encounter with the plaintiff, could show that harassment was "because of sex." 240 F.3d at 261. But the *Lack* court found that there was no earnest solicitation in the case before it, despite repeated and regular vulgar and lewd sexual comments from the male supervisor directed to the male plaintiff. These included one incident in which the supervisor asked to speak to the plaintiff in the cloakroom and, when plaintiff told him he was off the clock, the supervisor replied, "[O]h good, I am too," and motioned as if he were going to unzip his pants. *Id.* at 258. There was another incident in which the supervisor approached the plaintiff, grabbed his own crotch and called plaintiff by name, saying "[H]ere is your Christmas present." *Id.* Because the supervisor made similar vulgar comments to others, including in front of or about women, and because there was insufficient evidence that the supervisor harbored or pursued a sexual interest in the plaintiff, as opposed to teasing and taunting, the court held that the evidence could not support the jury's verdict.

Applying these principles, other courts within the Fourth Circuit have concluded that harassment was not because of sex in circumstances similar to, or more egregious than, those alleged by Dooley. For example, in *Atkins v. Computer Scis. Corp.*, 264 F. Supp. 2d 404, 410–11 (E.D. Va. 2003), the court concluded that the female plaintiff failed to show an "earnest sexual solicitation" where the alleged harasser, also a female, gave plaintiff full body hugs, pressed her breasts against plaintiff, demanded after hours meetings, and exposed her thighs to plaintiff, because the woman did not make sexually-oriented comments to plaintiff or directly proposition her for sexual favors.

Similarly, in *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 843 (E.D. Va. 2002), the alleged male harasser slapped the male plaintiff's behind, while saying "Hi Chuckles" and "we need to bond," and he also pressed his genitals against the plaintiff's shoulder. Additionally, he taunted the plaintiff with sexually tinged comments and teasing. The evidence was that the harasser engaged in similar conduct with others in the workplace, and was generally boorish, although he did

6

so more with men than women. But the plaintiff believed that the harasser was gay, and he alerted his supervisor of this fact. The court reasoned that, where the evidence of homosexuality was based on the harasser's conduct and the plaintiff's subjective belief that the harasser was gay, that was insufficient to meet the plaintiff's burden. It specifically distinguished *Oncale*, where the homosexuality of the harasser was an undisputed fact. *See id.* at 846 n.11 (citing *Equal Employment Opportunity Comm'n v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 522 (6th Cir. 2001)).

In this case, there is no credible evidence that Howe is gay; indeed, there is nothing other than Dooley's belief and the speculation of co-workers to support any finding that Howe is gay. Just as in *English*, evidence based on subjective beliefs and the harasser's conduct is insufficient to allow the case to go to a jury. That is especially true where, as here, the conduct did not involve any solicitation by Howe of a sexual act. There is simply no evidence from which a reasonable jury could find that Howe was soliciting Dooley. Dooley's subjective belief that Howe was doing so is not sufficient. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463 (6th Cir. 2012). In *Wasek*, another same-sex harassment case, the harasser not only told sexually explicit jokes and stories and called the plaintiff names, but also repeatedly touched the plaintiff in a sexual manner—grabbed his buttocks, poked him in the rear with a hammer handle and a long sucker rod—and made comments such as "You've got a pretty mouth," "boy you have pretty lips," and "you know you like it sweetheart." 682 F.3d at 465. Despite this offensive conduct, the court reasoned that there was insufficient evidence on the "because of sex" element where the plaintiff simply believed the harasser was "possibly bisexual" and interested in him sexually. The same is true here.

For these reasons, the court concludes that summary judgment in Capstone's favor is appropriate as to the sexual harassment claim.

## II. Retaliation

### A. Facts related to retaliation claim

In addition to Dooley's complaint to Truett, which the court has already discussed, there are two other incidents that are relevant to the retaliation issue, both of which occurred during the final shift Dooley worked on July 16. First, on that date, Dooley and another employee, German Roman, were in the office eating lunch in the middle of their shift (the overnight shift), at around 1:30 a.m. Dooley explained that work was "slow" at the time. As they were seated and eating, Howe walked in and said something like, "What do you fucking guys think you are doing here eating?" The employees responded that "it's lunchtime, stuff like that, we are slow." According to Dooley, Howe's comment pissed him off, and so he told him again not to "disrespect him." He also said something about Howe's sore throat comment being the sort of comment that could get Howe killed where Dooley came from, which Dooley defended in his deposition as a true statement and not a threat. According to Dooley's deposition testimony, which the court must credit at this stage, Dooley never stood up, never raised his voice, never swore at Howe or called him any names, and never threatened to beat him up or threatened him with physical violence during this encounter. (Dooley Dep. 79–87.)

After that incident, Howe sent a lengthy text to Truett in which he described the encounter in detail from his point of view. According to Howe, Dooley verbally attacked him, saying "'fuck you punk ass faggot' over and over as well as promising to 'beat my mother fucking ass' while pointing his finger in my face several times." (July 16, 2016 text from Howe to Truett at 1:57 a.m., Dkt. No. 60-9.)

Later that same shift, Dooley was driving his switcher in the lane where he was supposed to be, according to him. He testified that, as he drove by, he saw Howe in the smoking area, which is alongside the switcher lane. But he maintains that Howe was not close to him and that at no point did

he drive his switcher near Howe. Instead, Howe was between 12 and 15 feet away at all times. Despite this, Howe accused Dooley of trying to hit Howe with his switcher. Howe claims that he had to jump out of the way to avoid being hit. Howe admitted that he was not hit, that he did not yell or scream at the time, and that he never called 911 or the police to report the incident. Instead, Howe reported the incident to both Truett (whom Howe was on the phone with at the time) and to others on site, claiming that Dooley had tried to run him over.

There is a video of the incident from a parking lot security camera, although it is too far away to clearly view the incident and certainly too far away to see if Howe was even present, let alone to determine how close Dooley's switcher came to him. It does appear to the court that the switcher pulled to the right shortly before turning left, but whether it needed to do so in order to make the wide left turn is unclear. In any event, Truett testified that the decision had been made to terminate Dooley before Truett saw the video, simply based on Howe's reports to him. Immediately after the incident, though, Howe talked to the security personnel from a company called Atlas, who were on-site. He apparently viewed the video of the incident from the Atlas office, and the decision was made to remove Dooley from the site. This decision was made either by the security personnel or at Capstone's urging. An employee of Atlas asked Dooley to leave the premises immediately and not return to the site "until all this is sorted out." (Dooley Dep. 100.) Dooley further testified that the Atlas employee told him "It will probably all blow over and you will be back tomorrow." (*Id.*) Several days later, when Dooley called Truett, Truett told him that he was terminated, although Truett refused to give a reason. (*Id.* at 107–110.)

At the time that the driving incident occurred, Howe was on the phone with Truett, who was at home.[4] After Dooley had been removed from the premises, Howe completed a "Corrective Action Notice" about the incident, in which he refers to himself in the third person and states that Dooley drove "into the crosswalk/smoking area" and "nearly struck a fellow employee (the site supervisor), missing by several inches only as the supervisor moved out of the way." (Corrective Action Notice, Dkt. No. 60-18.) That form indicates that the consequence for the action is that "[Dooley] is terminted [sic] and will not be allowed back on the property." (*Id.*) On the same form, there is also a box checked that says "Termination" as the action to be taken. (*Id.*)

Critically for purposes of resolving the summary judgment motion, neither Howe nor Truett could remember which one of them had checked that box, thus leaving open the possibility that it was Howe who recommended or implemented the termination. Indeed, at one point in his deposition, Truett said Howe had terminated Dooley. (Truett Dep. 21.) He later testified, in response to questions from Capstone's counsel, that Howe did not play a role in the termination. (*Id.* at 84, 86.) So, there is a dispute as to who actually made the termination decision, but there is sufficient evidence from which the jury could conclude that Howe was the decision-maker, or at least played a role.[5]

After his termination, Dooley called Capstone's Human Resources Department to complain about being accused of something he did not do, which he attributed to retaliation for his complaint

---

[4] The communications between Howe and Truett regarding the incidents that night were a focus of Dooley's summary judgment briefing, although the court does not view those communications as any clear evidence of collusion between Howe and Truett. They both testified that after the alleged cursing incident earlier in the shift (at about 1:30 a.m.), Howe sent Truett the lengthy text describing that incident. Then, Truett testified that after he woke up and happened to see the text, he called Howe and was on the phone with Howe when the driving incident occurred. Phone records reflect that Howe called Truett at approximately 2:52 a.m., and Truett called Howe at 2:53 a.m., at which point they were on the phone for nine minutes. There were two subsequent phone calls during the 3:00 a.m. hour, as well: a 4-minute call at 3:20 a.m. from Howe to Truett, and a 13-minute call at 3:40 a.m. from Truett to Howe. Aside from Truett's testimony that he woke up on his own, as opposed to being awoken by Howe's call, the phone records are generally consistent with both Truett's and Howe's testimony.

[5] Truett's testimony on the termination decision was also unclear as to the timing of the decision. That is, he testified that he was headed into the facility to terminate Mr. Dooley shortly after the driving incident had occurred. (Truett Dep. 83.) But he later said that he made the decision to terminate Dooley "[a]s soon as I heard what he had said to [Howe] and Mr. Dooley confirmed it." Mr. Dooley did not "confirm" his alleged comments until days later, however, and only confirmed the comment that Howe's "joke" could get a person killed where Dooley was from.

against Howe. The complaint was taken and referred to James Eickemeyer, a Regional Director at Capstone and Truett's supervisor. Eickemeyer testified that he spoke to Truett about the matter and believed what Truett told him about the entire matter, but admitted that he never spoke with Howe or Dooley, and never investigated anything or was asked to investigate anything regarding Dooley's complaint. No further action was taken against anyone by Capstone.

Also relevant is that Capstone has given different reasons at different times as to why Dooley was terminated. As noted, the Corrective Action Notice, which said he was terminated, only referred to the driving incident. (*See* Dkt. No. 60-18.) Truett later completed a document that referenced the "Reasons for Termination," in which he mentioned both the driving incident and Dooley's alleged cursing and threats to Howe. In Capstone's written submission to the EEOC in response to Dooley's charge, however, it referenced only the cursing incident in the office, but did not mention the driving incident. (*See* Dkt. No. 60-16.)

### B. Discussion

A retaliation claim under Title VII requires the employee to prove all three elements of a prima facie case: "(1) . . . the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) a causal connection existed between the protected activity and the adverse action." *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 242 (4th Cir. 1997) (citation omitted). If Capstone rebuts the prima facie case by producing a legitimate, non-discriminatory reason for the adverse action, then Dooley must show that the given reason is pretextual. *See id.*

For purposes of summary judgment, Capstone admits that the first two elements are undisputed. That is, it is undisputed that Dooley complained to Truett about Howe's conduct toward him (or at least the most egregious "sucking dicks" comment), and that Dooley was terminated less than a week later. Captsone argues, though, that Dooley has no evidence from which a reasonable jury could conclude that he was terminated for complaining. Instead, it argues that Truett terminated

11

him for threatening Howe on his final shift and for the driving incident. Capstone also argues that Truett had no reason not to believe Howe's explanation of the driving incident, so that even if Dooley is correct that the incident did not occur as described by Howe in the incident report, Truett reasonably believed Howe.

The court concludes, however, that there are disputes of fact about the circumstances surrounding Dooley's termination, including who made the decision and the reasons for it. These facts, as set forth above and taken in a light most favorable to Dooley, could support a finding of pretext and a finding that retaliation was the real reason for the termination. Facts on three issues, in particular, support the court's conclusion.

First, the temporal proximity of Dooley's complaint and his termination—mere weeks apart—is alone some evidence of retaliation, at least for purposes of establishing a prima facie case. *See, e.g., Silva v. Bowie State Univ.*, 172 F. App'x 476, 478 (4th Cir. 2006) (holding that a ten-week time period can be sufficient to establish a prima facie case of retaliation); *see also Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250–51 (4th Cir. 2015) (noting that causation standards for proving a prima facie case and proving but-for causation are different). This is particularly true in this case, where Dooley's complaint was about Howe and he was terminated solely for conduct directed toward Howe and based primarily on Howe's description of events.

Second, there have been shifting reasons given by Capstone for Dooley's termination, which also can be evidence of pretext. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (acknowledging that a changed reason for termination can support a finding of pretext, but declining to apply it in that case because there was undisputed testimony that the employer gave a different reason to the unemployment commission so that plaintiff could still receive unemployment); *Mohammed v. Cent. Driving Mini Storage, Inc.*, 128 F. Supp. 3d 932, 951 (E.D. Va. 2015).

Third, and most importantly, there is some evidence (in the form of Truett's testimony and the Corrective Action form) that Howe made the decision to terminate Dooley. If a jury were to believe that Howe was the decision-maker and believed Dooley's account of both incidents, then it could reasonably infer that Howe made up the driving incident to get Dooley fired, and he made up or exaggerated the earlier incident during lunch in order to have even more of a basis for termination. There is certainly evidence to the contrary, as well, and a jury may well disbelieve Dooley and believe the accounts given by Howe and Truett. But that is a credibility determination, and one that cannot be made by the court at the summary judgment stage.

For all of these reasons, summary judgment will be denied as to Dooley's retaliation claim.

## III. Punitive Damages

Capstone also seeks summary judgment as to Dooley's punitive damages claim. Punitive damages in Title VII cases are limited to cases in which the employer "has engaged in intentional discrimination," as opposed to a disparate impact theory, and has done so either "[1] with malice or [2] with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999). Although Dooley failed to address the issue of punitive damages in his written filings, his counsel argued at the hearing that it believed the evidence supporting a finding of pretext could also support a finding that Capstone (and Howe, in particular) acted with malice in terminating Dooley. Thus, Dooley appears to base his claim only on the actual malice prong and not the reckless indifference inquiry that would be satisfied by a jury's finding of the four factors set forth in *Lowery v. v. Circuit City Stores, Inc.*, 206 F.3d 431, 443–45 (4th Cir. 2000) (discussing and setting forth the four factors).

For the same reasons set forth in the preceding section, the court concludes that there are disputes of fact as to plaintiff's entitlement to punitive damages. In particular, a reasonable jury could find that Howe was the decision-maker and that Howe made up the events to retaliate for

13

Dooley's complaint against him. If that were found, the court believes that these facts could support a finding of "malice" sufficient to support an award of punitive damages. Thus, it will deny summary judgment as to the punitive damages claim.

## CONCLUSION

For the foregoing reasons, the court will grant summary judgment as to Dooley's sexual harassment claim and will deny it as to his retaliation claim and his claim for punitive damages. An appropriate order will be entered.

Entered: June 19, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge